# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-2527

_____

| | | |
|---|---|---|
| Enterprise Leasing Company, doing business as Enterprise Rent-a-Car, a Minnesota corporation, | * * * * | |
| Plaintiff-Appellee, | * * | Appeal from the United States District Court for the |
| v. | * * | District of Minnesota. |
| Metropolitan Airports Commission, a public corporation, | * * * * | |
| Defendant-Appellant. | * * | |

_____

Submitted: February 16, 2001

Filed: May 30, 2001

_____

Before RICHARD S. ARNOLD, LAY, and HANSEN, Circuit Judges.

_____

LAY, Circuit Judge.

This case presents the question of whether Minnesota law authorized the Metropolitan Airports Commission ("MAC") to impose an 8.5 percent gross revenue fee on certain rental car companies doing business at the Minneapolis-St. Paul Metropolitan Airport ("Airport"). Upon full review, we find that the district court erred

as a matter of law in holding that MAC exceeded its statutory authority by imposing the fee.

## I.

Enterprise Leasing Company is a Minnesota corporation doing business as Enterprise Rent-A-Car ("Enterprise"). MAC is a public corporation chartered by the State of Minnesota to manage commercial aviation services at the Airport. Minnesota law empowers MAC to enact ordinances for the purpose of managing and operating the Airport. See Minn. Stat. Ann. § 473.608, subd. 17 (2001).

In 1998, MAC enacted Ordinance 85, which is the subject of this case. The ordinance requires that all "off-Airport"[1] rental car companies pay MAC a fee equal to 8.5 percent of their gross receipts for transactions occurring on Airport property. Enterprise is an off-Airport agency subject to the fee. Ordinance 85 is not applicable to "on-Airport" rental car companies, but those companies also pay MAC a fee equal to 8.5 percent of their gross revenues, as well as rental fees based on the amount of Airport space they occupy.

Ordinance 79 was the predecessor to Ordinance 85. That ordinance imposed an annual permit fee, plus a $1.75 per-transaction fee, on all off-Airport ground transportation vehicles using designated commercial lanes. In 1993, an exclusive roadway was opened for such vehicles to pick up and drop off passengers at the Airport. Ordinance 79 was intended to recover the actual capital and operating cost of

[1]"Off-Airport" rental car companies pick up customers at the Airport but do not otherwise rent space, maintain service counters, or conduct their operations on Airport property. "On-Airport" rental car companies rent space at the Airport from MAC and maintain service counters and fleets of rental vehicles on Airport property. All rental car companies have the option to bid for the six available rental car concession agreements on Airport property.

that roadway and its related facilities. Prior to enacting Ordinance 79, MAC researched commercial vehicles' use of the Airport and calculated the fee to recover the cost of those vehicles' use of Airport resources. MAC's cost analysis included investigating the daily volume of commercial vehicles at the Airport, researching user fees at similar airports, and conducting a series of informational meetings with members of the commercial ground transportation industry.

Ordinance 79 also served as a litmus test of MAC's statutory authority to impose Airport user fees. In Hyland v. Metropolitan Airports Comm'n, 538 N.W.2d 717 (Minn. Ct. App. 1995) ("Hyland I"), the court held that statutes creating and governing MAC authorized it to charge fees to commercial vehicles picking up and dropping off passengers at the Airport.

In November 1996, growing Airport traffic and a $2 billion Airport expansion project prompted MAC to explore ways to increase Airport revenue. MAC staff proposed a new commercial vehicle ordinance as a means to that end. Believing that all rental car companies had access to the same Airport market, MAC staff recommended that off-Airport rental car companies be assessed a user fee that was (1) comparable to the fees paid by such companies at other national airports, and (2) established at a rate similar to that paid by on-Airport companies. MAC then commissioned a study that addressed four factors: (1) fees charged to rental car companies by other major airports in the nation; (2) rationales asserted by other airports to justify such fees; (3) potential increase in revenue that MAC could anticipate from a change in fee structure; and (4) recommendations for implementing a new fee structure. Ultimately, MAC proposed a new fee structure whereby off-Airport rental car companies would pay a user fee equal to 8.5 percent of their gross Airport-generated revenues.[2]

---

[2]The fee under Ordinance 85 only applies to off-Airport rental car companies. The ordinance maintains a $1.75 per-transaction fee for other ground transportation

Prior to its enactment, MAC held public meetings and solicited public comment concerning Ordinance 85. At a public hearing on November 13, 1997, Enterprise was among the off-Airport rental car companies voicing the opinion that although off-Airport companies should pay a "fair share," they should not pay the same fee as the on-Airport companies because off-Airport companies do not receive the same services as those whose business is conducted on Airport property. Enterprise suggested that a fee in the range of 6 to 6.5 percent was more appropriate than an 8.5 percent fee. MAC defended the 8.5 percent figure on grounds that on-Airport companies pay in excess of $1 million a year beyond the percentage of sales fees, which means that even with Ordinance 85, off-Airport companies would not pay the same overall fees as companies based on Airport property. MAC enacted Ordinance 85, effective May 1, 1998, with the 8.5 percent fee.

Enterprise brought suit in the United States District Court for the District of Minnesota, alleging that the fee imposed under Ordinance 85 violated the Minnesota and United States Constitutions and exceeded MAC's authority under state law. Specifically, Enterprise claimed that the fee constituted an impermissible tax, and in the alternative, it violated Minnesota Statute section 473.651.

MAC moved for summary judgment on all of Enterprise's claims and Enterprise cross-moved for partial summary judgment on its statutory claim. The district court granted MAC's motion as to all of Enterprise's constitutional claims. However, the

service providers.

-4-

court granted Enterprise's motion on its claim under section 473.651.[3] See Enterprise Leasing Co. v. Metropolitan Airports Comm'n, 92 F. Supp. 2d 936 (D. Minn. 2000).

## II.

We review *de novo* questions of state law decided by the district court. See John T. v. Marion Indep. Sch. Dist., 173 F.3d 684, 687 (8th Cir. 1999). The Minnesota courts have not interpreted section 473.651 as it relates to the issue in this case. Where the meaning of a state agency's authorizing legislation is not explicit, the court gives deference to the agency's interpretation. See Minn. Stat. § 645.16(8) (1947); McAfee v. Department of Revenue, 514 N.W.2d 301, 304 (Minn. Ct. App. 1994) (finding that an agency's interpretation of a statute is entitled to consideration and that such consideration increases when the agency is construing a statute it administers and its construction is longstanding). However, an agency's interpretation "does not preclude a different construction by the courts." See Gust v. Minnesota Dept. of Natural Res., 486 N.W.2d 7, 9 (Minn. Ct. App. 1992).

## III.

The issue before us is whether the district court erred in finding that MAC violated Minnesota Statute section 473.651 when it levied a fee equal to 8.5 percent of off-Airport rental car companies' gross revenues.

---

[3]The court's original Order enjoined MAC from enforcing the 8.5 percent fee against off-Airport rental car companies. However, on MAC's Motions to Alter or Amend the Judgment and Stay Enforcement of the Judgment Pending Appeal, the court issued a second Order which stayed enforcement of the first Order upon MAC's posting of a bond. See Enterprise v. Metropolitan Airports Comm'n, Civ. No. 98-1327 (D. Minn. May 30, 2000).

MAC has broad statutory authority and discretion to manage the Airport in the public's best interest. See Minn. Stat. Ann. § 473.608 (enumerating powers and conferring upon MAC "all the powers as a body corporate necessary and convenient to accomplish the objects and perform the duties prescribed" by statute); Hyland v. Metropolitan Airport Comm'n, 884 F. Supp. 334, 336 (D. Minn. 1995) ("Hyland II") ("The Minnesota legislature has delegated to MAC broad statutory authority to improve, maintain, operate, and manage airports in a manner which will, in MAC's opinion, further the interest of aeronautics in the state of Minnesota."). Minnesota law specifically grants MAC the authority to assess fees on Airport users, providing that:

> [MAC] shall have the authority to determine the charges for the use of any of the property under its management and control, and the terms and conditions under which such property may be used. Where there is reasonable basis for classification of users as to any use, [MAC] may classify users, but charges as to each class shall be reasonable and uniform for such use, and established w*ith due regard to the value of the property and improvements used and the expense of operation to [MAC]*.

Minn. Stat. Ann. § 473.651 (2001) (emphasis added).

The district court found that MAC failed to give due regard to the value of the property and improvements used by off-Airport rental car companies and the expense of operation to MAC. According to the district court, section 473.651 required MAC to consider the *specific* Airport resources off-Airport companies *actually use*. Because MAC considered the value of customer market generated by the *entire* Airport when it created the new fee structure, the district court concluded that MAC exceeded its statutory authority and granted summary judgment in favor of Enterprise.

Two primary factors framed the district court's analysis. First, the court opined that Hyland strictly construed section 473.651, such that MAC may only impose on off-Airport rental car companies user fees that reflect a direct link to the cost of the specific

roadways and facilities those companies actually use to service their customers. Second, the court was unpersuaded by case law that embraces the notion that rental car companies benefit from, and therefore "use," the market created by an entire airport facility.

We find the district court's analysis to be overly narrow and its statutory interpretation legal error. Our analysis leads to the conclusion that MAC was within its broad discretionary authority under section 473.651 when it considered the entire Airport facility in developing Ordinance 85. Accordingly, we reverse the district court's grant of summary judgment.

**A.**

One of our basic concerns is the district court's understanding that the statutory interpretation of section 473.651 is controlled by Hyland I. The district court determined that "[i]n Hyland [I], the court appeared to adopt a more narrow interpretation of the phrase 'property and improvements used,' including only the specific commercial roadways and other facilities actually used by ground transportation companies within its definition." Enterprise, 92 F. Supp. 2d at 942. We find this is a misreading of Hyland I and that the district court afforded it undue weight in evaluating the instant case.

In Hyland I, the Minnesota Court of Appeals found that section 473.651 authorized MAC to impose the Ordinance 79 per-transaction fee, which was designed to recover costs "directly associated with the use of commercial ground transportation roadways and facilities." 538 N.W.2d at 720. According to the court, the cost recovery purpose of Ordinance 79 and the fee to achieve it were squarely within MAC's purview and "patently reasonable" under section 473.651. See id.

Although Hyland I stands for the proposition that MAC may recover direct costs under section 473.651, it goes too far to suggest that it circumscribes MAC's discretion to consider other factors when calculating user fees.[4] We find nothing in the statutory language or in Hyland I to support such a narrow interpretation. To the contrary, as we have discussed, MAC's authorizing legislation bestows upon it broad authority to manage and fund the Airport. The decision in Hyland I was limited to MAC's authority to recover direct costs because Ordinance 79 was designed to recover direct costs. However, Ordinance 79 differs significantly from the ordinance before us.

The scope of Ordinance 85 is broader than its predecessor because it is aimed toward a broader goal. Additional revenue is needed to fund the $2 billion Airport expansion project, MSP 2010. MAC rationalized that the benefits flowing from the Airport expansion would greatly increase the number of customers to which all rental car companies have access. The goals of Ordinance 85 and MAC's rationale in calculating the fee structure fully complement MAC's mandate to operate the Airport in a self-sustaining manner and its broad discretion to charge fees to Airport users. See 49 U.S.C. § 47107(a)(13) (1997); Minn. Stat. Ann. §§ 473.608, subd. 1, 473.651.

In fulfilling our duty to forecast how the Minnesota Supreme Court would likely interpret section 473.651, we consider relevant state precedent. See McCallum v. Rosen's Diversified, Inc., 153 F.3d 701, 703 (8th Cir. 1998) (en banc). In doing so, we are not obligated to defer to the district court's interpretation of that precedent. See id. Contrary to the district court, we find that Hyland I is distinguishable and that its application of section 473.651 to Ordinance 79 is not controlling in this case.

---

[4]Cf. Enterprise, 92 F. Supp. 2d at 942 (acknowledging that statute does not limit MAC to assessing fees based solely on the cost of maintaining the Airport's commercial roadways).

**B.**

We also disagree with the district court's rejection of the widely accepted idea that airport users benefit from the existence of an entire airport facility.

The basic issue of airport valuation is not novel. It has been addressed by other courts, albeit under different legal principles and statutes that are similar, but not identical, to section 473.651. The vast majority of authorities that have considered the question embrace the notion that commercial entities in a very real sense use an entire airport and the market it generates. Absent statutory language to the contrary, this widely accepted principle guides our interpretation of section 473.651.

The district court rejected as persuasive authority <u>Evansville-Vanderburgh v. Delta Airlines, Inc.</u>, 405 U.S. 707 (1972), and its progeny, which generally find under a Commerce Clause analysis that airport user fees may be premised on the value of an entire airport market. Specifically, the district court found these cases inapposite because they are predicated on the "benefit conferred" language articulated in <u>Evansville-Vanderburgh</u>.[5] The court reasoned that a more restrictive interpretation was warranted in the instant case because section 473.651 requires MAC to consider the

---

[5]<u>Evansville-Vanderburgh</u> held that insofar as an airport user fee is

based on some fair approximation of use or privilege for use . . . and is neither discriminatory against interstate commerce nor excessive in comparison with the governmental benefit conferred, it will pass constitutional muster, even though some other formula might reflect more exactly the relative use of the state facilities by individual users.

405 U.S. at 716-17.

value of the property and improvements used, not the benefits conferred upon the user.

The district court also distinguished authorities from other jurisdictions that have embraced a statutory interpretation allowing airport authorities to consider the value of an entire airport market when assessing airport user fees. The court reasoned that "the relevant question is not whether courts in other jurisdictions have upheld gross receipts fees similar to those assessed under Ordinance 85, but whether the more restrictive language of section 473.651 permits such an assessment." Enterprise, 92 F. Supp. 2d at 941.

Notwithstanding the district court's steadfast reliance on the terminology set forth in section 473.651, it also recognized that "the statute does not define with any specificity the method or methods that MAC permissibly may apply in order to value the property used," and found that the legislature intended "to confer upon MAC the discretion to apply any method of valuation that is reasonable." Id. at 942. Moreover, the district court acknowledged that the value of Airport property used for commercial purposes is affected by "its proximity to the market of consumers that the Airport generates." Id.

We find that the constitutional cases cited by MAC are not dispositive of the issue at bar, but do inform our analysis. Those courts that have rejected Commerce Clause challenges to various airport user fees generally hold that rental car companies benefit from the very existence of an airport and the market it generates, not just those parts of the airport the companies actually use.[6] Although the Commerce Clause cases

---

[6]See, e.g., Evansville-Vanderburgh, 405 U.S. at 716-17; Alamo Rent-A Car, Inc. v. Sarasota-Manatee Airport Auth., 906 F.2d 516, 520 (11th Cir. 1990); Alamo Rent-A-Car, Inc. v. City of Palm Springs, 955 F.2d 30, 31 (9th Cir. 1992); Westrac, Inc. v. Walker Field Colo., Pub. Airport Auth., 812 P.2d 714, 718 (Colo. Ct. App. 1991).

turn on a different legal principle, we cannot ignore the broader notion they embrace: that commercial users of an airport benefit from the entire facility.

It also is instructive to examine other states' laws that empower local airport authorities to levy fees on airport users.  For instance, Louisiana law contains statutory language identical to section 473.651 in that it authorizes the local airport authority to charge off-airport rental car companies fees which are "reasonable and uniform for the same class of privilege or service and . . . established with due regard to the property and improvements used and the expense of operation to the authority."  La. Rev. Stat. Ann. § 2:605(B) (1992).  However, the Louisiana statute goes on to require  that such fees "be based upon the cost to the airport of the particular facilities or services used by such nontenant, auto rental user."  Id. at § 2:605(D).  By virtue of paragraph D, Louisiana law specifically circumscribes the airport authority's power to assess fees based on the particular airport resources used by rental car companies located off airport property.  Minnesota law, by contrast, contains no similar limiting language.

Other states that allocate broad statutory authority for local airport authorities to charge user fees generally find that off-airport rental car companies benefit from the existence of the entire airport and may be charged accordingly.[7]  The common

_____

[7]See, e.g., Hefflefinger, Inc. v. City of Portland, 739 A.2d 844, 847-88 (Me. 1999) ("[e]ven though the rental agencies assert that they impose a minimal burden on the City when they drive through the airport picking up customers, the City may charge them for the use of the airport and its roadways and for the maintenance of the entire airport because the charges are authorized by the statute and the rental agencies benefit from the entire airport."); Alamo Rent-A-Car v. Board of Supervisors of Orange County, 221 Cal. App. 3d 198, 208, 272 Cal. Rptr. 19, 25 (1990) (rejecting that airport user fees be limited to actual use and finding that off-airport rental car companies benefit "from all phases of the Airport operation."); Jacksonville Port Auth. v. Alamo Rent-A-Car, Inc., 600 So.2d 1159, 1164 (Fla. Dist. Ct. App. 1992) (embracing the idea that an "off-airport rent-a-car company benefits from, and therefore in a very real sense 'uses,' the *entire* airport facility at which it operates.") (emphasis in original).

-11-

denominator in these cases is the idea that airport maintenance and construction is undertaken for airline passengers, who in turn are customers for all rental car companies.

Consistent with the broad scope of the statutory language at issue and with those authorities that have examined airport valuation in other contexts, we find that section 473.651 allowed MAC to consider the value of the entire Airport in developing the Ordinance 85 fee.

## C.

In making the assessment that Ordinance 85 is authorized by section 473.651, we also find that MAC gave "due regard" to the value of property and improvements used by off-Airport rental car companies. The statute does not define the term due regard except to the extent that it specifies to what MAC must give such regard: the value of the property and improvements used and the expense of operation. See Minn. Stat. Ann. § 473.651. When a term is undefined, Minnesota law directs that we construe the term "according to [its] common and approved usage." Minn. Stat. § 645.08(1) (1947). Black's defines due regard as "[c]onsideration in a degree appropriate to demands of the particular case." Black's Law Dictionary 501 (6th ed. 1990). This definition tells us that some measure of discretion is inherent in the phrase due regard. See Commonwealth of Virginia v. Marshall, 599 F.2d 588, 594 (4th Cir. 1979) (agreeing that "'due regard' does not mean 'deference'"). Such discretion is also apparent from the context of the enabling legislation in which section 473.651 occurs. See Bailey v. United States, 516 U.S. 137, 145 (1995) (considering the context in which statutory language occurs as a factor in ascertaining the meaning of its terms). To effectuate section 473.651, the legislature granted MAC "all the powers as a body corporate necessary and convenient to accomplish" user fees. Minn. Stat. Ann. § 473.608, subd. 1. MAC's general authority under section 473.608, juxtaposed with

its specific authority under 473.651, empowers MAC with broad discretion to calculate and impose fees on Airport users.[8]

Despite MAC's broad discretion, the terms of the statute do not give MAC a carte blanche to levy fees that are unreasonable. Even if the entire Airport is the benchmark for assessing value, we assume a reasoned approach includes some inquiry into the specific value off-Airport rental car companies derive from the Airport market. In other words, if the term "Airport market" is substituted for "property and improvements used," it may still be a lesser market and therefore of lesser value to companies not located on the Airport's premises.

The record supports that MAC conducted an extensive investigation into the value of the property and improvements used by off-Airport rental car companies. MAC adopted Ordinance 85 after an open and public legislative process during which the views of all parties potentially affected by the fee structure were solicited. MAC identified the goals that the fee structure was designed to achieve, including specific revenue goals and alternative means to achieve them. Enterprise, along with other off- and on-Airport rental car companies, was given the opportunity at public hearings to provide input into the Ordinance 85 fee structure. Testimony from those hearings shows that Enterprise did not object to the concept of the new fee. It simply argued in favor of a fee that was two percent less than what MAC had proposed. MAC was required to listen to Enterprise's arguments, see Minn. Stat. Ann. § 473.608, subd. 17(4), but it was not required to adopt them.

---

[8]As one commentator has observed, these legislative powers, both expressed and implied, "give the Commission almost unlimited authority and power to regulate aviation operations in the Twin Cities metropolitan area." Donald V. Harper, The Minneapolis-St. Paul Metropolitan Airports Commission, 55 Minn. L. Rev. 363, 375 (1971).

MAC also commissioned a study that reported on the fee structures at other major airports in the United States, the potential increase in revenues that MAC could anticipate from a change in fees charged to off-Airport rental car companies, and recommendations for implementing a new fee structure at the Airport. The study identified several factors that contribute to differences between fees charged to on- and off-airport rental car companies at other airports.[9] Commissioning this study and using its results in the legislative process was well within MAC's authority to engage in any activities necessary and convenient to accomplish its legal obligation to maintain and develop the Airport. See id. at subd. 1. There is no evidence that the results of this study served as the sole basis for the new fee structure. The study did, however, provide MAC with valuable comparison data in determining the reasonableness of an 8.5 percent fee.[10] MAC's use of this information is akin to a real estate appraiser computing the value of a home, in part, by assessing the value of other homes in the neighborhood.

Finally, MAC considered the $2 billion expansion project under way at the Airport and identified those capital expenditures which would be funded by Ordinance

---

[9]Those factors include: (1) inability of certain small agencies to meet annual guarantee bidding requirements for on-airport privileges; (2) high expense of operating off-airport; (3) lack of walk-up customers; (4) airport configuration; (5) legal restrictions; and (6) local community interest. As a result, some airport authorities charge off-airport companies up to six percent less than they charge to on-airport companies. Other authorities charge the same user fee, regardless of whether the company is located on or off airport premises.

[10]It is worth noting that the 8.5 percent fee under Ordinance 85 is well within the range of other airport user fees across the country. Fees as high as ten percent of gross revenues have been deemed reasonable. See, e.g., Alamo Rent-A-Car, Inc. v. Sarasota-Manatee Airport Auth., 906 F.2d at 520.

85.[11]  As we have discussed, this expansion project is intended to attract and accommodate growing passenger volume at the Airport.  More Airport passengers translates into a larger customer market for all rental car companies that service the Airport.

The structure of the Ordinance 85 fee inherently accounts for the difference in value that the Airport affords to on- and off-Airport rental car companies in that it is based on Airport-generated gross revenues.  In other words, the fee paid by off-Airport companies is commensurate with the volume of business that the entire Airport generates for the particular rental car company subject to Ordinance 85.  Accordingly, we are satisfied that the fee reflects MAC's due regard to the value of the Airport market that off-Airport rental car companies use.

## IV.

Given the broad discretion the legislature granted to MAC in assessing fees and the legislative process MAC undertook in crafting Ordinance 85, we find that MAC fulfilled its statutory duty to give due regard to the value of the property and improvements used by off-Airport companies.

In concluding that the district court erred, we emphasize that substantial deference is afforded to a state agency's interpretation of a statute the agency administers.  The cases are legion that MAC's interpretation of the statute cannot be set aside unless it is arbitrary, capricious, an abuse of discretion, or otherwise not supported by law.  See, e.g., Friends of the Boundary Waters Wilderness v. Dombeck,

---

[11]In particular, MAC considered the $25 million to reconstruct the inbound/outbound roadway; $25 million to construct an automated "people mover" to transport auto rental customers; $63 million to construct a new Humphrey Terminal; and $400 million to build a new North/South Runway.

164 F.3d 1115, 1121 (8th Cir. 1999).  Because we find that Minnesota law authorized the Ordinance 85 fee, we decline to substitute our policy judgments for those which are within MAC's exclusive province.  See United States v. Kabat, 797 F.2d 580, 591-92 (8th Cir. 1986).

We therefore reverse the grant of summary judgment by the district court and remand for an entry of judgment in accordance with this opinion.[12]

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[12]In view of this court's findings that the fee was reasonable and authorized, under Minnesota law we need not consider whether the fee constitutes an unauthorized tax.